## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DWAYNE JONES

Criminal Action Nos.
13-cr-577-2 and 16-cr-33-1

July _9th_, 2020                                          Anita B. Brody, J.

## MEMORANDUM

At this point, the global crisis the COVID-19 pandemic has caused hardly needs to be detailed. We are all living with its effects. There are over 12 million confirmed cases of COVID-19 worldwide, and 3 million confirmed cases in the United States.[1] Over half a million people have died from the disease, including over 130,000 people in the United States.[2] There is currently no approved cure, treatment, or vaccine to prevent it.[3] People with pre-existing medical conditions—like petitioner Dwayne Jones—face a particularly high risk of dying or suffering severe health effects should they contract the disease.

Mr. Jones is 48 years old and has hypertension, bulging discs in his back, local infections of skin and subcutaneous tissue, hyperlipidemia (high cholesterol), chronic pain, and other ailments.[4] Presentence Investigation Report [hereinafter "PSR"] ¶¶ 68-71; Def. Am. Mot. for

---

[1] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University of Medicine Coronavirus Resource Center (accessed July 9, 2020), https://coronavirus.jhu.edu/map.html.

[2] *Id.*

[3] *See Coronavirus disease 2019 (COVID-19)*, Mayo Clinic (accessed July 9, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/diagnosis-treatment/drc-20479976.

[4] Mr. Jones's medical records reflect that his hyperlipidemia and skin infections are in remission, however, it seems as though he was only last tested for hyperlipidemia on August 7, 2019. Def. Reply Br., Ex. A, 38, 53.

Compassionate Release ¶ 10 [hereinafter "Def. Am. Mot."].  He also has a metal rod in his left leg and suffers from recurring pain as a result of a motorcycle accident.  PSR ¶¶ 68, 69.

Mr. Jones is an inmate at FCI McKean, a minimum-level federal prison camp.  He was subject to two indictments—first on September 23, 2015 and again on February 3, 2016—for similar crimes including conspiracy to distribute oxycodone, distribution of oxycodone and aiding and abetting, acquiring controlled substances by fraud and aiding and abetting, money laundering concealment, and money laundering.  PSR ¶¶ 1, 6.  For the first indictment, he was found guilty by jury trial of multiple counts and for the second, he pleaded guilty.  *Id.* at ¶¶ 3, 8.  On January 11, 2018, Mr. Jones was sentenced to ninety-six months imprisonment and three years supervised release for each case, to be run concurrently.  Judgment as to Dwayne Jones (No. 13-cr-577-2), ECF no. 119; Judgment as to Dwayne Jones (No. 16-cr-33-1), ECF no. 100.  Mr. Jones has been detained since his arrest on October 2, 2015.  PSR, 2.  Considering his good conduct and participation in the Residential Drug Abuse Program, Mr. Jones's anticipated release date is July 26, 2021.  U.S. Probation Office Mem. (July 8, 2020) [hereinafter "Probation Mem."].  Additionally, Mr. Jones is eligible for home detention on January 26, 2021.  *Id.*  Mr. Jones moves for a reduction of his prison sentence and immediate release under the "compassionate release" statute, 18 U.S.C. § 3582(c)(1)(A).  He argues that "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. §3582(c)(1)(A)(i).

For Mr. Jones, nothing could be more extraordinary and compelling than this pandemic.  Mr. Jones lives with a laundry list of ailments, including hypertension, that may make him especially vulnerable to the effects of COVID-19 should he become infected.[5]  "People with

---

[5] The CDC notes, "COVID-19 is a new disease. Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19. Based on what we know at this time, people with the following conditions might be at an increased risk for severe illness from COVID-19: . . . hypertension or high blood pressure."  Coronavirus

several chronic conditions [including high blood pressure] are more likely to experience

dangerous symptoms if infected with COVID-19."[6]  A study of COVID-19 patients found that

out of all the participants included in the study, "[t]he proportion of patients with hypertension

among non-survivors was higher than that among survivors (26.70% vs. 74.00%)."[7]

These statistics become even more concerning when considered in the prison context.

Prisons are tinderboxes for infectious disease.  The question whether the government can protect

inmates from COVID-19 is being reexamined every day as outbreaks continue to emerge and

new testing efforts reveal that the rate of infection in many correctional facilities is far higher

than previously imagined.[8]  After reviewing the law and evaluating all the submissions and

evidence that have been presented, I conclude that Mr. Jones must be granted "compassionate

release."

---

Disease 2019 (COVID-19), Centers for Disease Controls and Prevention (accessed July 9, 2020, updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[6] *COVID-19: Who's at higher risk?*, Mayo Clinic (July 3, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301.  Because hypertension is also called high blood pressure, the terms will be used interchangeably.  *See About High Blood Pressure*, Centers for Disease Control and Prevention (accessed July 9, 2020), https://www.cdc.gov/bloodpressure/about.htm.

[7] Qing Yang, et al., *Effect of hypertension on outcomes of adult inpatients with COVID-19 in Wuhan, China: a propensity score-matching analysis*, 21 Respiratory Research 172 (July 6, 2020), https://doi.org/10.1186/s12931-020-01435-8.

[8] *See, e.g.*, *A State-by-State Look at Coronavirus in Prisons*, Marshall Project (June 25, 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons; Jeremy Roebuck & Allison Steele, *Montgomery County's jail tested every inmate for COVID-19—and found 30 times more cases than previously known*, Philadelphia Inquirer (Apr. 28, 2020), https://www.inquirer.com/news/coronavirus-testing-montgomery-county-jail-asymptomatic-philadelphia-prisons-20200428.html; Kevin Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort*, USA Today (Apr. 25, 2020, updated Apr. 27, 2020), https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/.

## I.    DISCUSSION

18 U.S.C. § 3852(c)(1)(A) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.[9]  Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term.  The policy statement lists three specific examples of "extraordinary and compelling reasons," as well as a "catchall" provision if the Director of the Bureau of Prisons ("BOP") determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described."  U.S.S.G. § 1B1.13, cmt. n.1(A)-(D).  In addition, the policy statement provides that a sentence reduction may only be granted if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  *Id.* § 1B1.13(2).  Furthermore, the policy statement mirrors the language of § 3582(c)(1)(A) and requires a court to consider the applicable § 3553(a) factors.

Although § 3582(c)(1)(A) requires a reduction in sentence to be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded, in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018, and the Sentencing Commission's failure to "update[] its policy statement to account for the changes imposed by the First Step Act," that "the policy statement is now clearly outdated."  *United*

---

[9] Mr. Jones's motion is properly before the Court because he has complied with § 3582(c)(1)(A)'s 30-day lapse provision.  *See* 18 U.S.C. § 3582(c)(1)(A) (providing that a prisoner can file a motion with the court upon the "lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility").  He submitted a petition for compassionate release to the warden of FCI McKean on March 30, 2020, and was denied on April 2, 2020.  Def. Reply Br., Ex. B (Letter from Warden Denying Defendant's Request for Compassionate Release).

*States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020).

Accordingly, while "the policy statement may provide 'helpful guidance' [it] does not limit the

Court's independent assessment of whether 'extraordinary and compelling reasons' exist under

§ 3582(c)(1)(A)(i)."[10]  *Id.* at *4.  I consider (1) whether "extraordinary and compelling reasons"

exist to reduce Mr. Jones's sentence based on the enumerated criteria in the policy statement and

an independent assessment; (2) whether Mr. Jones is a danger to the community under § 3142(g);

and (3) whether the § 3553(a) factors support a sentence reduction.

### A.  Extraordinary and Compelling Reasons Exist

Mr. Jones's circumstances—particularly the outbreak of COVID-19 and his underlying

medical conditions that may place him at a high risk should he contract the disease—present

"extraordinary and compelling reasons" to reduce his sentence.  Black's Law Dictionary defines

"extraordinary" as "[b]eyond what is usual, customary, regular, or common."  *Extraordinary*,

Black's Law Dictionary (11th ed. 2019).  It defines "compelling need" as a "need so great that

irreparable harm or injustice would result if it is not met."  *Compelling Need*, Black's Law

Dictionary (11th ed. 2019).

Mr. Jones's health conditions render him especially vulnerable to COVID-19, and prison

is a particularly dangerous place for him at this moment.  In addition, he has served the majority

of his sentence and has demonstrated rehabilitation in prison.  None of these reasons *alone* is

extraordinary and compelling.  Taken together, however, they constitute reasons for reducing his

sentence "[b]eyond what is usual, customary, regular, or common," and reasons "so great that

---

[10] For an in-depth discussion of the interplay between the amendment to § 3582(c)(1)(a) and the policy statement, which explains this Court's reasoning here, see *Rodriguez*, 2020 WL 1627331, at *2-6.  *See also, e.g.*, *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019); *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. June 28, 2019).

irreparable harm or injustice would result if [the relief] is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling Need*, Black's Law Dictionary (11th ed. 2019).

As previously noted, Mr. Jones suffers from a number of medical conditions: hypertension, hyperlipidemia, chronic pain, local infections of skin and subcutaneous tissue, bulging discs in his back, and he has metal implants in his body. Out of all of his medical conditions, his hypertension is the most likely to place him at high risk of grave illness or death if he gets infected with coronavirus. As described above, hypertension has been identified as a "specific comorbidit[y] associated with increased risk of infection and worse outcomes."[11] A recent study of 5,700 patients with COVID-19 in the New York City area revealed that the most common comorbidity was hypertension (56.6%).[12] In New York State, 90% of the 24,944 total fatalities caused by COVID-19 had at least one comorbidity and the top comorbidity was hypertension (13,288 fatalities).[13] The third leading comorbodity was hyperlipidemia (5,186 fatalities). This is particularly unfortunate for Mr. Jones because he suffers from both hypertension and hyperlipidemia.

In addition to Mr. Jones's health conditions that place him at increased risk of severe negative outcomes from COVID-19, Mr. Jones's age is a risk factor. Mr. Jones is 48 years old.

---

[11] Ernesto L. Schiffrin et al., *Hypertension and COVID-19*, 33 American Journal of Hypertension 373, 373 (May 2020), https://academic.oup.com/ajh/article/33/5/373/5816609. Two studies from Wuhan, China revealed: "The most common comorbidities in one report were hypertension (30%), diabetes (19%), and coronary heart disease (8%). Another report showed that the most frequent comorbidities in patients with COVID-19 who developed the acute respiratory distress syndrome were hypertension (27%), diabetes (19%), and cardiovascular disease (6%)." *Id.* (footnote omitted).

[12] Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184.

[13] *COVID-19 Tracker*, New York State Department of Health (accessed July 9, 2020), https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n.

A study based on data "from individuals who tested positive for COVID-19 in 38 countries . . . found that risk of death from the disease rose with each decade of age."[14]  The death rate for people in their forties who had COVID-19 is double the death rate for people in their thirties.[15]  The CDC has also consistently found over the course of the pandemic that death counts rise with each decade of age.[16]

In the absence of a deadly pandemic that is deadlier to those with Mr. Jones's underlying conditions, these conditions might not constitute "extraordinary and compelling reasons."  It is the confluence of COVID-19 and Mr. Jones's health conditions that makes this circumstance extraordinary and compelling.

Given Mr. Jones's vulnerability to COVID-19, prison is a particularly dangerous place for him.  Although the government represents that FCI McKean has no cases of COVID-19, less than 7% of inmates at the facility have been tested.[17]  As of July 9, 2020, less than 18% of approximately 144,000 federal inmates in this country have completed testing.[18]  Of those tested, almost 30% of inmates had COVID-19.[19]  Correctional facilities that have made the decision to undertake mass testing have discovered dramatically higher numbers of infected inmates than

---

[14] Erin Schumaker, *Risk for severe COVID-19 increases with each decade of age*, abcNEWS (Apr. 1, 2020), https://abcnews.go.com/Health/risk-severe-covid-19-increases-decade-age/story?id=69914642 (citing Robert Verity et al., *Estimates of the severity of coronavirus disease 2019: a model-based analysis*, Lancet Infectious Diseases (Mar. 30, 2020), https://doi.org/10.1016/S1473-3099(20)30243-7).

[15] *See Id.*

[16] *See Weekly Updates by Select Demographic and Geographic Characteristics: Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control & Prevention, Age & Sex, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed July 9, 2020).

[17] *See COVID-19 Cases*, Federal Bureau of Prisons (accessed July 9, 2020), https://www.bop.gov/coronavirus/index.jsp; FCI McKean, Federal Bureau of Prisons (accessed July 9, 2020), https://www.bop.gov/locations/institutions/mck/.

[18] *COVID-19 Cases*, Federal Bureau of Prisons (accessed July 9, 2020), https://www.bop.gov/coronavirus/index.jsp.

[19] *Id.*

previously imagined.[20]  For instance, when Montgomery County, Pennsylvania tested every inmate in custody, it discovered "a rate of infection more than 30 times greater than what Montgomery County had identified before it began its mass testing."[21]  Similarly, when a prison in North Carolina tested all of its inmates, it discovered that it had not 39 cases—as it had previously thought—but 444 cases.[22]  In both facilities, this spike was in large part due to the number of infected inmates who have been asymptomatic.[23]

Despite the BOP's lack of testing, several virus hotspots have emerged and the BOP's reported cases of COVID-19 are growing.  For instance, at FCI Elkton, 935 out of 2,228 tested inmates were positive.[24]  The BOP now reports that 2,267 inmates and 211 BOP staff "have confirmed positive cases" and 5,128 inmates and 603 staff have recovered, while 94 inmates and one staff have died.[25]  Because the BOP has tested so few inmates, however, these statistics almost certainly underestimate the true number of infections and the number of affected BOP facilities.  According to Leonard Rubenstein, a professor at Johns Hopkins Bloomberg School of Public Health, "Unless you do universal testing in all environments, the risk of spread is enormous.  If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on. . . . It's too late."[26]

---

[20] *See supra* note 7.

[21] *See* Roebuck & Steele, *supra* note 7.

[22] *See* Johnson, *supra* note 7.

[23] *See id.*; Roebuck & Steele, *Montgomery County's jail tested every inmate for COVID-19—and found 30 times more cases than previously known*, *supra* note 7.

[24] *COVID-19 Cases*, *supra* note 17; *FCI Elkton*, Federal Bureau of Prisons (accessed July 9, 2020), https://www.bop.gov/locations/institutions/elk/.

[25] *COVID-19 Cases*, *supra* note 17.

[26] *See* Johnson, *supra* note 7.

Without mass testing—and any detailed information about the current conditions at FCI McKean—the Court may be getting a false picture.  If the Court waits to act until the BOP confirms its first case of COVID-19 at FCI McKean, it may be too late for vulnerable inmates like Mr. Jones.  The Court should not take that risk.

Prisons are ill-equipped to prevent the spread of COVID-19.  Many of the recommended measures to prevent infection are impossible or unfeasible in prison.  Public health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer.[27]  Joseph J. Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate transmission.[28]

---

[27] *See, e.g.*, *How to Protect Yourself & Others*, Centers for Disease Control & Prevention (accessed July 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; Dr. Asaf Bitton, *Social distancing in the coronavirus pandemic — maintaining public health by staying apart*, Boston Globe (Mar. 14, 2020), https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-pandemic-maintaining-public-health-by-staying-apart/.

[28] *Declaration of Joseph J. Amon, Ph.D. MSPH* ¶ 20, Def. Reply Br. Ex. A, *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), ECF No. 134-1, also available at https://www.aclupa.org/sites/default/files/field_documents/dr._amon_declaration_march_30_2020.pdf.

While it is unclear exactly what the conditions at FCI McKean are like for inmates, there is no doubt that recommended social distancing and sanitary measures cannot be properly observed due to the communal nature of the prison.

Mr. Jones is also very close to his release date and has demonstrated significant rehabilitation. He is only *six months* away from his home detention eligibility date. Probation Mem. Keeping him in prison for six more months makes a marginal difference to his punishment, but a potentially profound difference to his health. That is why being so close to his home confinement eligibility date and release date adds to the extraordinary and compelling reasons to reduce his punishment.

Mr. Jones has also shown significant rehabilitation in prison. He has taken an array of education courses offered at FCI McKean including anger management, business etiquette and profession, investing in real estate, parenting, conflict management, and several health and nutrition courses. Probation Mem. Additionally, Mr. Jones took a commercial driver's license course while incarcerated. *Id.* He also successfully completed the Residential Drug Abuse Program, a 500-hour program to be completed over nine months. *Id.*; Def. Am. Mot., Ex. A. Furthermore, Mr. Jones pursued meaningful employment opportunities while incarcerated, including working as a camp driver at FCI McKean. Probation Mem. The government highlights that Mr. Jones has committed three disciplinary infractions while incarcerated: two for possessing an unauthorized item and one for refusing to leave a building. *Id.* These infractions were non-violent and do not raise concerns about recidivism.

Mr. Jones's physical vulnerabilities in light of this pandemic—chiefly that fact that he has hypertension—along with the amount of time he has served, his proximity to his release date, and his rehabilitation, constitute reasons for reducing his sentence "[b]eyond what is usual,

customary, regular, or common," and reasons "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling Need*, Black's Law Dictionary (11th ed. 2019).  Mr. Jones has presented "extraordinary and compelling reasons" to reduce his sentence.

### B.  Mr. Jones is Not a Danger to Others or the Community

The Commission's policy statement, which provides helpful guidance, provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

Mr. Jones is not a danger to the safety of others or to the community under the factors listed in in 18 U.S.C. § 3142(g).  Section 3142(g) sets out the factors courts must consider in deciding whether to release a defendant pending trial.  These factors weigh both the defendant's possible danger to the community and the defendant's likelihood to appear at trial.  Only the former is relevant here.  The factors that weigh danger to the community include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The offenses for which Mr. Jones is incarcerated are non-violent and do not suggest that he is a danger to the community.  Although he was convicted of conspiring to acquire oxycodone and distribute it, money laundering, and related charges, the record does not suggest that Mr. Jones was violent at any point.

The government argues that Mr. Jones is a danger to the community because of his convictions for unlawful possession of a handgun in 1997, theft in 1998, and possession of an illegal intercept device in 2000.  PSR ¶¶ 45-47.  Not only are these crimes non-violent, they occurred over twenty years ago.  The government also raises concern about several outstanding charges against Mr. Jones in 2015.  PSR ¶¶ 51-56.  These charges, however, did not result in a conviction.  *Id.*   Additionally, any concern that Mr. Jones's previous drug addiction could lead him to commit further crimes is minimized because of his successful completion of the 500-hour Residential Drug Abuse Program.  PSR ¶ 76.  Furthermore, Mr. Jones's age alone reduces his risk of recidivism and hence any concerns that he could be a danger to the community.[29]

Mr. Jones will not be a danger to the community during this pandemic because he has a home to return to, where he can self-quarantine, and an adequate reentry plan, as verified by the Probation Office.[30]

## C.  The Section 3553(a) Factors Support a Sentence Reduction

Finally, the Court must "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A).  Section 3553(a) "contains an overarching provision instructing district courts to '*impose a sentence sufficient, but not greater than necessary*,' to accomplish the goals of sentencing."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (emphasis added) (quoting 18 U.S.C. § 3553(a)).  These goals include:

> the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and

---

[29] *Report-At-A-Glance: Recidivism & Federal Sentencing Policy*, United States Sentencing Commission (Mar. 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf (noting that "[s]tudies have repeatedly shown older offenders to have a lower risk of reoffending and the Commission's study confirmed this finding").

[30] On July 7, 2020, the U.S. Probation Office in New Jersey conducted an in-person home assessment at the defendant's proposed future residence, his mother's house in Willingboro, New Jersey.  Probation Mem.

> to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  The other applicable sentencing factors the Court must consider are "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *Id.* § 3553(a)(1), (6).

Reducing Mr. Jones's sentence to time served accomplishes the purposes of sentencing. The court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes."  *Id.* § 3553(a).  Mr. Jones is only half a year away from his home detention eligibility date.  He has already served nearly five years in prison, which is long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of Mr. Jones.  As recognized by the National Institute of Justice, "[i]ncreasing the severity of punishment does little to deter crime."[31]  Continuing to incarcerate Mr. Jones will do little to protect the public because, as already discussed, Mr. Jones's age makes him less likely to recidivate.[32]  *See id.* § 3553(a)(2)(C).  Rather than being long enough to provide Mr. Jones with needed medical care, further imprisonment may interfere with his ability to get needed medical care.  To prolong his incarceration would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

---

[31] *National Institute of Justice: Five Things about Deterrence* 1, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

[32] *See Report-At-A-Glance: Recidivism & Federal Sentencing Policy, supra* note 28.

"[T]he nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), as discussed in more detail in the previous section, also support a sentence reduction.  To reiterate, however, Mr. Jones is just six months away from home confinement.  He has already served five years in prison for non-violent offenses.  And he is a 48-year-old with serious health conditions that may lead to an increased risk of serious illness from COVID-19.

Finally, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *Id.* § 3553(a)(6).  Because Mr. Jones is only six months away from home detention, one year away from his release date, and has served a majority of his sentence, granting his motion sufficiently minimizes sentence disparities between him and similarly situated defendants.

The applicable § 3553(a) factors support a sentence reduction for Mr. Jones.

## II.    CONCLUSION

Mr. Jones's sentence was never intended to include a grave risk of severe illness or death from an unforeseen pandemic.  For this reason, and the others elaborated here, I will grant Mr. Jones's motion for compassionate release.  I will sentence him to time served and three years of supervised release with the conditions that he be placed on home confinement and location monitoring until his current projected release date of July 26, 2021.  Mr. Jones will also be ordered to self-quarantine in his home for 14 days.

S/Anita B. Brody
ANITA B. BRODY, J.

**XC: Counsel; US Marshals (#72432-066); US Probation;**
**US Pretrial; Financial Litigation Unit**

Copies **VIA ECF** on